**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

United States Courts
Southern District of Texas
FILED

**DEC 29 2025**

Nathan Ochsner, Clerk of Court

ALEK MIRKO MASON and ELENA YANCHEVA YANEVA,
Plaintiffs,

v.

THOMAS ROGER LAWRENCE;
THOMAS LAWRENCE ENTERPRISES, INC.;
CONSTRUCTION RESOURCE ADVISORS, LLC;
JOEL DANIEL SLATON;
JOEL SLATON ENTERPRISES, INC.;
Defendants.

CIVIL ACTION NO. 4:25cv 6310

**COMPLAINT FOR DAMAGES, RESCISSION, INJUNCTIVE RELIEF AND DEMAND
FOR JURY TRIAL**

## SECTION I - INTRODUCTION

1.   This action arises from an asset purchase transaction in which Plaintiffs acquired the operating assets of a construction business formerly owned by Defendant Thomas Roger Lawrence, based on representations concerning the business's financial condition, continuity of operations, and post-closing management, including representations that the business maintained an active pipeline of prospective customer inquiries averaging one to two serious inquiries per week. *See Exhibit A*. In the period leading up to and following the closing, Defendants engaged in conduct that included the diversion and concealment of customer funds, the misuse of company accounts, and the disclosure of internal pricing and vendor information to third parties. Following the closing, Defendant Joel Daniel Slaton acted as General Manager of the acquired business and exercised authority over internal operations, vendor selection, pricing, and customer communications. Plaintiffs allege that Defendants' pre-closing and post-closing conduct not only resulted in the loss of Plaintiffs' largest projects, but also prevented the generation of new customer business, contributing to a sudden collapse in revenue, layoffs of staff, and the ultimate cessation of business operations. Plaintiffs seek damages and equitable relief arising from Defendants' fraudulent inducement, interference, and racketeering conduct, as detailed below.

2.    Plaintiffs expressly reserve the right to amend or supplement this Complaint to conform to additional facts, evidence, or legal claims that may be discovered as this matter proceeds, including, without limitation, additional racketeering predicates and state-law causes of action arising under Texas and Florida law.

## SECTION II – JURISDICTION AND VENUE

3.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert federal questions under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a), (c), and (d), including predicate acts of wire fraud, mail fraud, and a pattern of racketeering activity that directly injured Plaintiffs' business and property.

4.    This Court also has jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $30,000,000, exclusive of interest and costs. Plaintiffs Alek Mirko Mason and Elena Yancheva Yaneva are natural persons domiciled in Montgomery County, Texas, and are citizens of the State of Texas (Exhibit G)

5.    Defendant Thomas Roger Lawrence is a natural person domiciled in Florida and a citizen of the State of Florida. Defendant Thomas Lawrence Enterprises, Inc. is a Florida corporation with its principal place of business in Florida and is a citizen of Florida. Defendant Construction Resource Advisors, LLC is a Florida limited liability company whose members are citizens of Florida. Defendant Joel Daniel Slaton is a natural person domiciled in Florida and a citizen of the State of Florida. Defendant Joel Slaton Enterprises, Inc. is a Florida corporation with its principal place of business in Florida and is a citizen of Florida.

6.    This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' related state-law claims, including but not limited to fraudulent inducement, common-law fraud, breach of contract, breach of fiduciary duties and the duty of good faith and fair dealing, tortious interference with existing and prospective business relations, and civil conspiracy, because those claims form part of the same case or controversy as the federal RICO claims and arise from a common nucleus of operative facts involving the same business acquisition, the same parties, and the same continuing course of misconduct.

7. Venue is proper in the United States District Court for the Southern District of Texas, Houston Division, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District. Plaintiffs resided in Montgomery County, Texas at all relevant times and conducted material aspects of the transaction from this District, including financial decision-making, review and approval of transaction documents, and execution of closing directives. While Plaintiffs were in Conroe, Texas, Defendants engaged in pre-closing misconduct directed into this District, including the transmission of false and manipulated Work-In-Progress and Accounts Receivable schedules, misrepresentations regarding operations and goodwill, and communications intended to induce Plaintiffs to proceed with closing. Defendants further directed interstate wire communications and payment instructions into this District, including closing communications that caused Plaintiffs to authorize Huntington Bank to wire purchase funds to Defendant Thomas Lawrence Enterprises, Inc. Plaintiffs' reliance on Defendants' misrepresentations, inducement to proceed with the transaction, and execution of closing directives occurred in this District, rendering Texas the locus of the fraudulent inducement and racketeering injury. Defendant Construction Resource Advisors, LLC was formed after closing, but its creation and subsequent conduct are part of the same continuing scheme that originated with Defendants' acts purposefully directed into this District.

8. Exercising jurisdiction over all Defendants comports with traditional notions of fair play and substantial justice because Defendants' intentional conduct was expressly aimed at Plaintiffs in Texas and caused significant injury in this forum.

9. Venue in this District is not only proper but substantially more appropriate than any alternative forum. This action is overwhelmingly document-driven and centers on Defendants' financial misconduct, electronic communications, accounting records, work-in-progress schedules, bank transactions, insurance records, and internal business data, all of which are maintained in electronic form and accessible in this District. The operative facts concern Defendants' directed communications, inducement, concealment, and diversion of funds, rather than localized physical events or third-party eyewitness testimony. Defendants Lawrence and Slaton are parties to this action and cannot establish inconvenience based on their own travel preferences. Any attempt to transfer venue would merely shift inconvenience from Defendants to Plaintiffs, contrary to 28 U.S.C. § 1404(a), and would undermine Plaintiffs' choice of forum where the economic injury, reliance, and decision-making occurred. Transfer would delay resolution, increase costs, and reward Defendants' intentional choice to direct fraudulent conduct into Texas, contrary to the interests of justice.

## SECTION III – PARTIES

10. Plaintiff Alek Mirko Mason ("Alek") is a natural person residing in Montgomery County, Texas, and was the purchaser of the business assets that are the subject of this action.

11. Plaintiff Alek Mirko Mason is the same individual formerly known as Aleksandar Musulin, the name under which he executed certain transaction documents, including the Asset Purchase Agreement. Plaintiff legally changed his name upon naturalization as a United States citizen on June 20, 2025.

12. Plaintiff Elena Yancheva Yaneva ("Elena") is Alek's wife and a resident of Montgomery County, Texas. Elena was directly injured by Defendants' misconduct and is a proper Plaintiff in this action.

13. Defendant Thomas Roger Lawrence ("Lawrence") is a natural person residing in Florida. Lawrence personally negotiated the Asset Purchase Agreement ("APA"), made the fraudulent inducements alleged herein, and continued engaging in post-closing conduct that interfered with the acquired business.

14. Defendant Thomas Lawrence Enterprises, Inc. ("TLE, Inc.") is a Florida corporation that Lawrence continued to operate after the APA despite having sold all business assets. TLE, Inc. remains a vehicle through which Lawrence directed post-closing interference.

15. Defendant Construction Resource Advisors, LLC ("CRA, LLC") is a Florida limited liability company created and operated by Lawrence shortly after closing. CRA, LLC functioned as a vehicle through which Lawrence continued contracting and consulting activities following the closing.

16. Defendant Joel Daniel Slaton ("Slaton") is a natural person residing in Florida. Slaton was represented to Plaintiff as the experienced General Manager of the Purchased Business and, in that role, exercised day-to-day operational control and exclusive practical access to internal project records, client communications, pricing information, and Work-In-Progress data relevant to Plaintiff's claims. While Defendant Lawrence retained ownership and ultimate authority prior to closing, Slaton functioned as the primary operational gatekeeper and was the individual through whom internal information flowed during the relevant period.

17. Defendant Joel Slaton Enterprises, Inc. ("JSE, Inc.") is a Florida corporation controlled by Slaton. JSE, Inc. served as the entity through which Slaton engaged in post-closing interference, competing work, and violations of his Independent Contractor Agreement with Plaintiffs.

## SECTION IV – FACTUAL BACKGROUND

18. "Purchased Business" means the operating construction business, including its workforce, projects, goodwill, and operations, acquired by Plaintiff Alek Mirko Mason pursuant to the Asset Purchase Agreement dated December 12, 2024, and thereafter operated by him.

19. "Plaintiff's operating account" refers to the primary operating bank account of Thomas Lawrence Construction, LLC, which was owned and controlled by Plaintiff Alek Mirko Mason following the December 12, 2024 closing.

20. In 2024, Defendant Thomas Roger Lawrence, through Defendant Thomas Lawrence Enterprises, Inc. ("TLE, Inc."), offered to sell his longtime construction business to Plaintiff Alek Mirko Mason ("Alek"). Lawrence represented that his company had been in business for over twenty-five (25) years, had an established reputation, and possessed substantial transferable goodwill.

21. As part of the sale process, Lawrence's business broker prepared and circulated a Confidential Information Memorandum ("CIM"). *See Exhibit B*. The CIM expressly represented that Defendant Joel Daniel Slaton ("Slaton") was the company's "General Manager," responsible for running day-to-day operations of the business.

22. Lawrence and the Confidential Information Memorandum ("CIM") represented that Defendant Joel Daniel Slaton effectively "ran the company" on a day-to-day basis, handling operational coordination, customer communications, and project administration, while assisting with estimating and supporting pricing functions. Beyond the CIM, however, Defendant Lawrence personally and repeatedly represented to Plaintiffs that Slaton was a fully capable estimator who understood the company's estimating practices, historical pricing, and job-costing approach, and who could competently handle estimating, project supervision, and operational management during Lawrence's anticipated transition toward retirement. Lawrence further represented that he had "geared down" his involvement, that Slaton could operate the business with minimal owner involvement when Lawrence traveled to North Carolina or New York, and that the business could continue to function independently under Slaton's management.

22A. Based on these representations, Plaintiff Alek Mirko Mason reasonably understood that, although Slaton might not be the long-term estimating solution, Slaton was capable of managing estimating and operational continuity in the short term, allowing Plaintiff time after closing to observe and understand the company's estimating process and, if necessary, later hire a dedicated estimator once operations stabilized. Lawrence further represented that the business regularly received one to two serious inquiries per week from new prospective customers, such that a steady flow of new work and future estimating demand would continue after closing.

22B. In reality, Lawrence deliberately obscured and failed to meaningfully explain how estimating was actually performed, while simultaneously overstating Slaton's estimating competence and independence. Contrary to Defendants' representations, the Purchased Business did not receive one to two serious new inquiries per week from new prospective customers after closing, and no such pipeline of new business existed as represented. The absence of new inbound prospects prevented Plaintiffs from stabilizing revenue, evaluating estimating needs, or hiring additional estimating support, and exposed that Defendants' pre-closing representations regarding operational capability, estimating continuity, and incoming business were materially false and misleading.

22C. As part of the pre-sale representations and selling narrative advanced by Defendant Lawrence and his broker, Plaintiffs were affirmatively led to believe that Defendant Joel Daniel Slaton's progression toward licensure was a key component of the transaction and that, upon Lawrence's anticipated retirement shortly after closing, Slaton would be able to serve as the qualifying license holder for the Purchased Business. At no time during the sale process did Lawrence, Slaton, or the broker disclose that Slaton's status as a 1099 independent contractor rendered him legally incapable, under Florida law and DBPR requirements, of serving as a qualifying agent for Plaintiffs' company absent an employment or ownership relationship. Florida law requires that a qualifying agent be *employed by* or *financially interested in* the business organization, and responsible for supervision and compliance. See, *e.g.*, Fla. Stat. §§ 489.105, 489.119. This regulatory impossibility was a material fact omitted from the sales process and would have fundamentally altered Plaintiffs' evaluation of the transaction. Relying on the misrepresented and incomplete licensing framework, Plaintiff Alek Mirko Mason proceeded with the purchase. After closing, and upon discovering that Slaton could not lawfully serve as a qualifier while Lawrence intended to withdraw yet continue extracting license-related payments, Plaintiff was forced to pursue his own Florida Certified Building Contractor ("CBC") license. Plaintiff obtained that license in or about August 2025 only after substantial investment of time, effort, and expense, undertaken solely to protect the company, comply with Florida law, and mitigate the harm caused by Defendants' misrepresentations and omissions.

23. During pre-closing diligence in or about September 2024, Lawrence affirmatively staged and curated Plaintiffs' perception of how the business operated. When Plaintiffs visited Lawrence's office with prospective clients present, Lawrence appeared in clean business casual attire and maintained an orderly, administrative office setting, creating the impression that he was no longer engaged in field operations and that Defendant Joel Daniel Slaton ran the company's day-to-day execution. Lawrence further reinforced this impression by personally escorting Plaintiffs to high-end projects in the Barefoot Beach area, representing them as examples of work being executed under Slaton's operational management rather than Lawrence's personal involvement.

24. In reality, and contrary to this curated presentation, Lawrence continued to work actively and regularly in the field, wearing construction attire and performing hands-on project work, while Defendant Slaton remained almost exclusively office-based. This staging created a materially false impression of the company's operational structure, Lawrence's disengagement, and Slaton's managerial independence, and was intended to induce Plaintiffs to believe the business could operate without Lawrence's ongoing involvement.

24A. Almost immediately after Plaintiffs began operating the Purchased Business following closing, Defendant Lawrence engaged in a deliberate pattern of passive avoidance and staged unavailability that was presented as "transition support" but functioned in practice as information withholding. Although Lawrence represented that he would assist with transition and knowledge transfer, he did not initiate, schedule, or meaningfully participate in any substantive discussions with Plaintiff Alek Mirko Mason regarding the business's estimating practices, customer relationships, operational workflows, or financial structure. Lawrence repeatedly portrayed himself as "too busy in the field," creating the appearance of ongoing involvement while avoiding any sustained engagement that would have allowed Plaintiff to understand how the business actually functioned. Plaintiff was left to pursue Lawrence informally and episodically for information, receiving only fragmented and superficial responses that never coalesced into a coherent explanation of operations. This manufactured busyness and avoidance were not accidental or incidental, but part of a coordinated post-closing strategy by Lawrence and Defendant Joel Daniel Slaton to create the illusion of transition support while preventing Plaintiff, as the new owner, from acquiring institutional knowledge that would have exposed the true nature of the business's estimating practices, customer relationships, and financial flows. Lawrence's conduct ensured that Plaintiff remained dependent on Defendants during the critical transition period while Defendants continued diverting funds and interfering with the Purchased Business.

25. In reliance on those representations, Plaintiff Alek Mirko Mason structured his post-closing role around business development, financial oversight, and systems stabilization, while Defendant Joel Daniel Slaton operated as the day-to-day General Manager with responsibility for field operations, project supervision, estimating support, and project management. Only months later—after Defendants' diversion of funds, interference with customer relationships, suppression of new business, and the resulting depletion of operating capital, and following the termination of the existing field supervisor—was Plaintiff forced, out of necessity, to personally attend job sites and assume additional project-management oversight in order to correct recurring errors, omissions, and execution failures that were jeopardizing ongoing work. These additional responsibilities were neither intended nor contemplated at the time of purchase and were directly caused by Defendants' misconduct.

25A. At the time of the transaction and throughout the post-closing transition period, Defendants Lawrence and Slaton were aware that Plaintiff Alek Mirko Mason's household had recently endured significant medical hardship, including his wife's diagnosis and treatment for Stage IV melanoma and a mastectomy. Defendants knew both before and after closing that Plaintiff was intentionally structuring his role to limit sustained field labor and physical strain and was relying on Defendants' repeated representations that the Purchased Business could be operated day-to-day by Defendant Slaton with minimal owner involvement. Despite this knowledge, Defendants engaged in conduct that foreseeably forced Plaintiff into expanded field and operational roles, exacerbated operational stress, and undermined the very reliance Defendants had induced. These circumstances were known to Defendants, were foreseeable, and rendered Defendants' representations regarding operational independence, management capability, and transferable goodwill materially false and misleading.

25B. Despite being represented and installed as the General Manager of the Purchased Business, Defendant Joel Daniel Slaton demonstrated no genuine effort or intent to develop new business, cultivate inbound opportunities, or support revenue generation following closing. Slaton did not meaningfully pursue new clients, did not assist in business development, and did not engage in activities reasonably expected of a general manager responsible for sustaining or growing the business. In ordinary circumstances, a general manager who fails to generate or support revenue would be subject to termination in short order. However, Plaintiffs were effectively constrained from terminating Slaton during the critical post-closing period because Defendants had represented that Slaton controlled, managed, and embodied the customer relationships and goodwill sold as part of the transaction. Slaton's refusal to assist in business development, coupled with Plaintiffs' inability to remove him without jeopardizing the very goodwill they had purchased, created a deliberate operational dependency that Defendants exploited to suppress Plaintiffs' revenue and maintain leverage over the Purchased Business.

26. Lawrence also represented that the business regularly received one or two serious new inquiries per week, that there was a strong pipeline of new customers, and that the company enjoyed strong goodwill and repeat business. Lawrence iterated that the average job value was around $150,000. In reality, after the December 12, 2024 closing, no meaningful new clients ever materialized, despite Plaintiffs' extensive efforts to run and grow the business.

27. Lawrence failed to disclose material facts concerning the nature and transferability of the "goodwill" being sold. More than ninety-one percent (>91%) of the purchase price was allocated to goodwill, yet Plaintiffs were not informed prior to closing that Lawrence resided within the same residential community as a substantial portion of the Purchased Business's active customers, maintained close personal relationships with many of them, and served in a governance or architectural review capacity within the homeowners' association alongside certain customers. These circumstances meant that a significant portion of the purported goodwill was personal to Lawrence and dependent upon his continuing proximity, social relationships, and community influence. These facts were not disclosed in the Confidential Information Memorandum, the Asset Purchase Agreement schedules, or pre-closing diligence communications and were not known to Plaintiffs at the time of closing. Such undisclosed facts were material to Plaintiffs' decision-making and risk assessment in connection with the transaction, as they directly bore on the transferability of goodwill and the likelihood of post-closing interference.

27A. Lawrence disclosed in the Consulting and Non-Compete Agreement that he jointly owned a vacant parcel of real property with Defendant Joel Daniel Slaton intended for future development. However, Lawrence did not disclose the full scope of his ongoing business affiliations, related entities, local real-estate interests, or the extent to which those interests overlapped geographically and competitively with the Purchased Business. Nor did Lawrence disclose the degree to which he remained economically active and locally entrenched within the same market and customer communities as the Purchased Business following closing. These omissions obscured the extent of Lawrence's continuing ability to compete with, interfere with, or reclaim business opportunities from the Purchased Business and materially distorted Plaintiffs' evaluation of post-closing competitive and interference risk.

27B. Immediately following closing, Defendants' concealment and information control became apparent. When Plaintiff Elena Yancheva Yaneva was present at the company office with Plaintiff Alek Mirko Mason during the initial transition period, Defendant Joel Daniel Slaton refused to engage in meaningful operational communications with her and withheld basic information necessary for transparent transition and oversight. Slaton's conduct was inconsistent with his represented role as General Manager and raised immediate concerns regarding concealment and resistance to oversight. As a result, Plaintiffs began preserving and reviewing company records, communications, banking activity, insurance transactions, accounting data, and operational materials to determine the source of emerging inconsistencies and shortfalls. Following Elena's return from a brief family visit abroad to see her newly born first granddaughter, Plaintiffs undertook a sustained internal review of company records and progressively identified additional diverted funds, undisclosed conflicts of interest, irregular accounting activity, and coordinated post-closing interference that had not been disclosed at or before closing.

27C. The scope of this investigation required extraordinary time and effort, consuming well in excess of one thousand hours of combined work by Plaintiffs, and materially diverting them from revenue-generating operations, business development, and the ordinary management of the Purchased Business, thereby compounding the damages caused by Defendants' misconduct.

28. Following closing, Defendant Lawrence remained in personal and social contact with numerous neighborhood residents who were also customers of the Purchased Business. Lawrence socialized with these individuals within the same residential community, including through routine neighborhood and recreational activities, and maintained a persistent personal presence among the very clients whose relationships were represented as transferable goodwill sold to Plaintiffs. This conduct was inconsistent with Lawrence's representations that he had retired, disengaged, and relocated away from the customer base, and materially interfered with Plaintiffs' ability to establish independent customer relationships.

29. Despite pre-closing representations that the business regularly generated referrals and that goodwill would continue following the sale, Lawrence failed to refer any meaningful new clients to Plaintiffs after closing. The absence of post-closing referrals further demonstrates that the purported goodwill was personal to Lawrence, was never meaningfully transferred, and was effectively retained and leveraged by Lawrence through his continued proximity and social influence within the customer community.

30. When introducing Plaintiff to existing clients, Lawrence consistently introduced Plaintiff as "the new owner" without affirmatively endorsing Plaintiff or reassuring clients that operations would continue under Plaintiff's ownership. Lawrence did not present Plaintiff as the ongoing point of trust or continuity for the business.

31. On or about December 12, 2024, Plaintiffs closed on the purchase of the business assets from TLE, Inc., relying on Defendants' representations in the CIM, in pre-closing calls and meetings, and in written and oral statements made by Lawrence and Slaton. At the same time, Lawrence executed non-competition and consulting agreements, and Slaton executed an independent contractor agreement ("ICA") that included non-compete and non-interference obligations. *See Exhibit C.*

32. In the final days before the December 12, 2024 closing, Defendants Lawrence and Slaton collected large advance payments and deposits from clients, including a customer deposit in the amount of $34,528.64 received from David B. Small. *See Exhibit E.* Defendants knew these funds were contractually required to be transferred to Plaintiffs as the new owners responsible for performing the associated work-in-progress. Instead of disclosing the collection or transferring the funds at closing, Defendants retained the funds in accounts they controlled, depriving Plaintiffs of operating capital required to perform the purchased projects.

33. In the twenty-four (24) hours immediately preceding the December 12, 2024 closing, Defendant Joel Daniel Slaton transmitted to Defendant Lawrence's counsel multiple successive versions of the company's Work-In-Progress and Accounts Receivable schedules. Each successive iteration reflected a substantial increase in reported accounts receivable, despite no corresponding work having been performed, invoiced, or collected during that period. Across these successive submissions, the reported accounts receivable increased by over $190,000. This material escalation was not disclosed to Plaintiffs at the time, was inconsistent with underlying job records, and served to misstate the financial condition of the business immediately prior to closing and to conceal diverted customer payments. These successive versions are reflected in *Exhibit D (Sub-Exhibits D1–D3).*

34. One representative and illustrative consequence of Defendants' pre-closing misconduct involves a client deposit in the amount of $34,528.64, received on or about October 31, 2024 by Defendant Thomas Lawrence Enterprises, Inc. in connection with the David B. Small project, representing ten percent (10%) of the total contract value. This deposit constituted customer funds attributable to a project that remained unperformed and unpermitted at the time of closing and, as such, was required to be disclosed and transferred to Plaintiffs at closing as part of the acquired work-in-progress. Defendants failed to disclose the deposit, failed to transfer it, and retained the funds, notwithstanding that Plaintiffs assumed full responsibility for the project following the December 12, 2024 closing.

34A. At the time the deposit was received and retained, no building permit had been issued, no construction activity had commenced, and no permit was issued until late April 2025. Photographs taken in March 2025 further confirm the complete absence of construction progress during the relevant period. The receipt and retention of the client deposit, the absence of permitting, and the lack of construction activity are reflected in *Exhibit E (Sub-Exhibits E1 and E2).*

35. After closing, Defendants concealed the diversion of these funds, as well as additional diverted funds later discovered, and left Plaintiffs to perform or attempt to perform work on projects that had already been prepaid to Defendants. Plaintiffs were thereby forced to absorb costs, labor, and risk without the corresponding revenue, undercapitalizing the acquired business from inception and setting it up for failure.

35A. Following closing, Plaintiff Alek Mirko Mason repeatedly requested that Defendant Joel Daniel Slaton provide a full and accurate reconciliation of customer deposits, work-in-progress balances, and pre-closing collections attributable to projects Plaintiffs assumed responsibility for after closing. These requests were made verbally on multiple occasions and were expressly memorialized in writing in an email dated January 17, 2025. Despite these repeated requests, Slaton never produced any reconciliation, accounting, or supporting documentation reconciling deposits, collections, work-in-progress balances, or closing adjustments. Instead, Slaton provided only raw or itemized transaction reports that listed individual charges or payments but did not tie those transactions to specific projects, deposits, pre-closing collections, or closing allocations and were wholly insufficient to constitute any reconciliation.

35B. When Slaton continued to withhold a reconciliation, Plaintiff Mason contacted Defendant Lawrence directly and asked whether Lawrence was instructing Slaton not to provide it. Lawrence denied any involvement and stated, in substance, that "Joel works for you now, not me." That statement was false. Under any ordinary and honest asset sale, Lawrence would have had the same incentive and obligation as Plaintiffs to ensure that customer deposits, work-in-progress balances, and pre-closing collections were accurately reconciled and properly allocated at or following closing. Yet Lawrence never once—verbally or in writing—requested a reconciliation from Slaton, despite knowing that such a reconciliation would have revealed diverted customer deposits, misstated work-in-progress figures, and the misallocation of pre- and post-closing funds that belonged to Plaintiffs, not Defendants. Slaton's continued refusal to provide a reconciliation, and Lawrence's disavowal of responsibility coupled with his complete inaction, were deliberate acts of concealment undertaken because Defendants knew that an accurate reconciliation could not be produced without exposing their diversion and misappropriation of Plaintiffs' funds.

36. Immediately following closing, Slaton knowingly and deliberately caused five separate liability-insurance premium payments totaling $10,444.05 to be taken online from Plaintiff's operating account, resulting in Plaintiff effectively paying duplicate insurance premiums — one set for Plaintiff's company and a second set for Defendant Thomas Lawrence Enterprises, Inc., a separate pre-sale entity that no longer owned or operated the Purchased Business. *See Exhibit E (Sub-Exhibit E3).* These payments caused Plaintiff to incur insurance costs twice each month for overlapping coverage, solely because Slaton routed payments for Lawrence's entity through Plaintiff's account.

36A. These insurance premium debits were initiated online and were not credit-card balance payments. Defendant Joel Daniel Slaton was given no authority to initiate online payments of any kind other than the limited, ministerial payment of known credit-card balances that were transparent and subject to Plaintiff's contemporaneous review. Slaton was not authorized to initiate online insurance payments, ACH debits, electronic transfers, or third-party obligations, and lacked authority under his Independent Contractor Agreement ("ICA") to bind Plaintiff, incur insurance obligations, or initiate electronic insurance payments for any entity.

36B. Despite this lack of authority, Slaton knowingly initiated multiple online insurance premium payments from Plaintiff Mason's operating account without Plaintiff Mason's knowledge or consent, fully aware that Plaintiff had no contractual or legal obligation to insure Defendant Lawrence's company. When Plaintiff Mason discovered the duplicate insurance charges and questioned Slaton, Slaton affirmatively misrepresented that the payments were "required for the transition" and would be refunded following an insurance audit. No such audit existed. Shortly thereafter, the duplicative payments ceased, and Slaton arranged for a separate insurance policy for Lawrence's entity, confirming that the prior payments were knowingly unauthorized and concealed. These online withdrawals were not accidental, mistaken, or administrative in nature, but constituted deliberate and calculated misappropriation of Plaintiff's operating funds, effected through deceptive electronic transactions and undertaken in furtherance of Defendants' coordinated fraudulent scheme. This conduct formed part of a broader pattern of unauthorized system access, circumvention of financial controls, and intentional diversion of funds through interstate electronic means.

37. At no time did Plaintiffs authorize Defendant Slaton to independently initiate, approve, or execute online payments on Plaintiffs' behalf. Any limited instruction relating to bill payment was confined strictly to ministerial tasks that were transparent and subject to Plaintiffs' review, such as payment of known credit-card balances. Slaton's unilateral initiation of electronic transactions outside those narrow parameters exceeded any permissible scope of authority, violated the ICA's governance limitations, and constituted an intentional usurpation of Plaintiffs' exclusive control over company finances.

38. During the same post-closing period, Defendant Joel Daniel Slaton repeatedly paid vendors and service providers for expenses of the Purchased Business using his personal funds and then sought reimbursement from Plaintiffs. Slaton undertook this conduct despite being expressly instructed by Plaintiff Alek Mirko Mason not to do so and despite lacking any authority under the Independent Contractor Agreement to advance funds, incur expenses on Plaintiffs' behalf, or act as a creditor to the business. When Plaintiff became aware of these transactions, he reimbursed Slaton effectively immediately—no later than the following business day—solely to prevent operational disruption, while again directing Slaton not to repeat the conduct. Slaton nevertheless continued the practice after being instructed to stop. This conduct bypassed Plaintiffs' financial controls, created undisclosed reimbursement obligations, improperly positioned Slaton as a self-created creditor, and further evidences Slaton's intentional disregard of Plaintiffs' authority and governance over the Purchased Business.

39. These unauthorized online payments depleted Plaintiffs' cash reserves, endangered ongoing insurance coverage, and immediately impaired Plaintiffs' ability to operate the business they had just purchased. The conduct constitutes multiple predicate acts of wire fraud under federal and state law, each causing direct injury to Plaintiffs' business and property.

40. When Plaintiff discovered these unexplained withdrawals, Slaton falsely claimed they were "required as part of the transition" and further represented that a "liability insurance audit" would refund all such payments. This statement was knowingly false. When Plaintiff contacted the insurance broker's representative George Garcia, Garcia confirmed unequivocally that no audit existed that would reimburse these premiums and that there was no legitimate basis for the additional charges drawn from Plaintiffs' account.

41. The misappropriation of these insurance premium payments furthered Defendants' fraudulent scheme by diverting operating funds and impairing Plaintiffs' ability to operate the acquired business.

42. Following the December 12, 2024 closing, Defendant Joel Daniel Slaton received multiple "bonus" payments from Defendant Lawrence's company, Thomas Lawrence Enterprises, Inc. ("TLE, Inc."), including payments of $2,750 on December 16, 2024, $5,000 on December 20, 2024, and $5,000 on December 28, 2024 for a total of $12,750. Despite having already received these substantial payments from TLE, Inc., Slaton thereafter caused TLE, Inc. to issue an invoice to Plaintiffs seeking reimbursement of an additional $2,750 "bonus" allegedly owed to Slaton's separate entity, Joel Slaton Enterprises, Inc., for the two-week period preceding January 5, 2025. That invoiced period included a full week during which the office was closed and no services were performed. The Independent Contractor Agreement permitted only a discretionary bi-weekly bonus conditioned on Company performance and services rendered, and did not authorize duplicative or pass-through bonus billing through TLE, Inc. Slaton's attempt to extract additional bonus payments from Plaintiffs under these circumstances was unauthorized, duplicative, and improper.

43. The invoice through which Defendants Lawrence and Slaton attempted to collect these improper charges was initially presented to Plaintiffs on an urgent, take-it-or-leave-it basis on January 17, 2025, immediately before Plaintiffs were required to leave our company office due to pre-existing, non-deferrable travel and professional commitments. Plaintiff Alek Mirko Mason expressly stated at that time that he did not have sufficient opportunity to review the invoice and did not consent to or approve the charges as presented. When Plaintiff later returned and executed the invoice, the same coercive conditions remained in place: Defendants continued to control access to essential business systems, information, and cooperation necessary to operate the Purchased Business, and made clear—expressly or implicitly—that refusal to execute the invoice would result in further disruption and harm. Under these circumstances, the execution of the invoice was not voluntary, was obtained under continuing economic duress and coercive pressure, and does not reflect a knowing or informed agreement to the charges imposed.

44. After closing, Slaton remained in place under his ICA but routinely communicated to customers and contacts that Lawrence remained available to perform work, thereby redirecting loyalty and business away from Plaintiffs.

45.  In addition to written and behind-the-scenes interference, Defendant Joel Daniel Slaton engaged in real-time insubordination and misdirection during recorded telephone calls involving prospective and existing clients. In these calls, Slaton contradicted Plaintiff Alek Mirko Mason's statements, undermined Plaintiff's authority, and redirected discussions away from Plaintiffs' business and toward Defendant Lawrence or Lawrence-affiliated entities. This conduct occurred while Slaton was acting under Plaintiffs' Independent Contractor Agreement and during client intake and sales communications, and materially damaged Plaintiffs' credibility, disrupted prospective business relationships, and furthered Defendants' coordinated scheme to divert goodwill and opportunities.

46.  In furtherance of this conduct, and while communicating with municipal permitting personnel regarding projects of the Purchased Business, Defendant Joel Daniel Slaton affirmatively misrepresented Plaintiff Alek Mirko Mason's competence and authority. On at least one such occasion following closing, Slaton stated to permitting personnel, in substance, that Plaintiff lacked understanding of the permitting matters at issue. Plaintiff personally heard this statement. Slaton made this representation while acting under Plaintiffs' Independent Contractor Agreement and while purporting to act on Plaintiffs' behalf. This conduct falsely disparaged Plaintiff to governmental authorities, undermined Plaintiffs' credibility in regulatory interactions, delayed permitting progress, and further impaired Plaintiffs' ability to operate the Purchased Business.

47.  Shortly after closing, Defendant Lawrence formed Construction Resource Advisors, LLC ("CRA, LLC"), Articles of Organization filed on January 21, 2025, purportedly as a "construction consulting" company. Lawrence used CRA, LLC to continue performing and facilitating construction-related services in the same geographic market and for the same client base as the Purchased Business, effectively operating a competing enterprise in direct contravention of the goodwill, non-competition, and non-interference obligations he had agreed to at closing.

48.  Despite his contractual non-compete and consulting obligations, Lawrence—through TLE, Inc. and CRA, LLC—continued to cultivate and service old clients, respond to inquiries, and redirect work away from Plaintiffs. Slaton coordinated with Lawrence by feeding him information and reassuring clients that Lawrence was still available to "take care of them," interfering with Plaintiffs' ability to retain and develop the customer base they had purchased.

49.     Following closing, Defendant Joel Daniel Slaton used Plaintiffs' computer systems and equipment, without Plaintiffs' knowledge or authorization, to collect, transmit, and share customer photographs and internal customer information with Defendant Lawrence. Slaton engaged in this conduct while acting under Plaintiffs' Independent Contractor Agreement and while using Plaintiffs' resources, for the purpose of assisting Lawrence in establishing and operating Lawrence's post-closing "construction consulting" business. The transmission and use of this customer information occurred without Plaintiffs' consent, outside any permissible scope of Slaton's authority, and in direct interference with Plaintiffs' ownership and operation of the Purchased Business. This conduct further diverted customer relationships, facilitated Lawrence's competing activities, and undermined Plaintiffs' ability to retain and service the customers and goodwill they had purchased.

50.     During the post-closing period in which Defendant Joel Daniel Slaton was billing and being compensated by Plaintiffs under his Independent Contractor Agreement, Slaton used Plaintiffs' computer systems, licensed software, internet access, utilities, and other operating resources—without Plaintiffs' knowledge or authorization—to assist Defendant Thomas Roger Lawrence in developing branding and online infrastructure for Lawrence's competing "construction consulting" business, Construction Resource Advisors, LLC. This misconduct included assisting with the creation of a new logo and facilitating the development of a website for that competing enterprise using Plaintiffs' systems and software. Slaton undertook these activities during time billed to Plaintiffs, failed to disclose them, did not seek or obtain permission, and did not reduce or offset his billings to account for time spent assisting Lawrence. Instead, Slaton diverted compensated time and Plaintiffs' operating resources to build and support a competing business for Lawrence, causing Plaintiffs to bear the costs of labor, overhead, and infrastructure. This conduct constituted theft of services, misuse of Plaintiffs' operating resources, and intentional interference with the Purchased Business.

51.     During the same post-closing period, Defendant Joel Daniel Slaton installed anti-spyware software on Plaintiffs' computer systems without Plaintiffs' knowledge or authorization. Slaton did not disclose the installation, did not obtain consent, and had no authority under his Independent Contractor Agreement to alter, monitor, restrict, or control Plaintiffs' computer systems. The unauthorized installation of this software raised serious concerns regarding concealment, monitoring of Plaintiffs' activities, and interference with Plaintiffs' control over their own systems, and was among the reasons Slaton was terminated. This conduct further evidences Slaton's misuse of Plaintiffs' computer systems and operating resources and his intentional interference with the Purchased Business.

52. During the post-closing period, Defendant Joel Daniel Slaton was tasked with migrating Plaintiffs' Microsoft 365 accounts away from Comcast due to excessive cost and in connection with Plaintiffs' required transition to a RingCentral VOIP system, T-Mobile office internet and centralized control of their Microsoft 365 environment. Instead of completing this task in a transparent and owner-controlled manner, Slaton retained exclusive control over administrative credentials, configured Plaintiff Alek Mirko Mason's access as a limited "guest," and established the primary Microsoft 365 tenant under an account bearing Slaton's own name and identifier. When Slaton was terminated, multi-factor authentication for the Microsoft 365 environment routed to Slaton's personal mobile device, effectively locking Plaintiffs out of their own company systems and email accounts.

53. As a direct result of Slaton's unauthorized control over Plaintiffs' Microsoft 365 environment, Plaintiffs were required to retain and pay a third-party Microsoft engineer to regain administrative access and restore operational control of their systems. This process resulted in significant lost time, cost and disruption to business operations. During this period, Plaintiffs discovered that contents of multiple company folders had been deleted without authorization, including a working folder maintained by Plaintiff Yaneva containing materials written in her native Cyrillic alphabet. Plaintiffs did not delete these materials, did not authorize their deletion, and had no administrative access at the time the deletions occurred. The unauthorized retention of system access, account lockout, and deletion of company data further evidences Slaton's misuse of Plaintiffs' computer systems, interference with Plaintiffs' operations, and intentional disruption of the Purchased Business.

54. After closing, Defendant Lawrence demanded that Plaintiffs enter into a separate consulting arrangement requiring payment at a rate of $150 per hour, subject to a mandatory minimum weekly commitment and additional vehicle charges—terms that had never been disclosed, negotiated, or contemplated prior to closing. These demands were made despite Lawrence's prior agreement and representations that post-closing transition assistance would be provided without additional charge, and notwithstanding Plaintiffs' reasonable expectation that such assistance was included as part of the transaction. This post-closing demand materially altered the economics of the transaction and functioned as a mechanism to extract ongoing payments from the business Plaintiff Mason had just purchased.

55.    In furtherance of this scheme, Lawrence treated the included transition-assistance period as exhausted and—while Defendant Joel Daniel Slaton actively facilitated—insisted that only Lawrence could perform certain work for the Purchased Business. During this period, Slaton repeatedly bypassed Plaintiff's field superintendent, Brian Doody, and redirected operational matters back to Lawrence, thereby forcing Plaintiff to incur additional consulting charges and reinforcing Lawrence's leverage over the business. This conduct was contrary to Defendants' pre-closing representations and Lawrence's contractual obligations under the Asset Purchase Agreement.

56.    *In one illustrative instance of Defendants' post-closing self-dealing,* Defendant Lawrence charged Plaintiffs $150 per hour to work and prepare an estimate for the fabrication of a generator stand for client James Foltz (owner of Arrow Electric), a customer relationship Plaintiffs had expressly purchased under the Asset Purchase Agreement. Lawrence directed Defendant Slaton—then acting under Plaintiff Mason's Independent Contractor Agreement—to prepare and transmit the estimate in the ordinary course of business. Unknown to Plaintiffs, Lawrence had already quoted the essentially identical generator-stand project directly to Foltz months earlier in the spring of 2024 and deliberately concealed that prior involvement so that he could bill Plaintiffs for preparing the estimate and later divert the project for himself. After Lawrence was paid for the work through Plaintiff Mason's company, Thomas Lawrence Construction, LLC ("TLC, LLC"), and Plaintiffs relied on Lawrence's representations, Lawrence diverted the generator-stand project, performing it through outside channels in direct violation of the APA's non-compete, non-interference, and customer-assignment provisions.

57.    Defendant Slaton, who at that time was affiliated with Plaintiff as an independent contractor "General Manager", governed exclusively by the ICA, lacked authority to assist Lawrence in servicing or diverting any customer purchased by Plaintiff, as the ICA was signed in full agreement of Defendant Lawrence as part of the APA. Nevertheless, Slaton participated in preparing estimates, communications, and project coordination for Lawrence relating to customers that were contractually off-limits.

58.    During the post-closing period, Defendant Joel Daniel Slaton entered into and facilitated multiple agreements, commitments, and arrangements relating to the business operations of Plaintiff Mason's company, Thomas Lawrence Construction, LLC ("TLC, LLC"), without Plaintiffs' knowledge, authorization, or approval. Slaton did not disclose these arrangements to Plaintiffs, did not seek consent, and did not provide notice by email or otherwise. Slaton lacked authority under the Independent Contractor Agreement to bind TLC, LLC, incur obligations on its behalf, or commit Plaintiffs to any agreements, and his undisclosed actions were outside the scope of any permissible role. Plaintiffs only discovered the existence of these arrangements after operational harm had already occurred.

59. In addition to diverting work, Defendant Lawrence withheld estimating guidance, and used Plaintiffs' lack of inherited institutional knowledge to impose undisclosed consulting charges and reclaim projects for his own benefit.

60. Slaton misused paid time billed to Plaintiffs to perform services for Lawrence, including transmitting internal company records and engaging in activities outside the scope of Plaintiffs' business, constituting theft of services and further acts in support of the enterprise. This conduct was not isolated or incidental, but occurred persistently and continuously during the period Slaton was billing Plaintiffs under his Independent Contractor Agreement.

60A. On information and belief, during the post-closing period and while Defendant Joel Daniel Slaton was acting as the direct supervisor of field personnel, including Brian Doody, false statements were circulated internally suggesting that Plaintiff Alek Mirko Mason was improperly diverting or siphoning company funds for personal use. These statements were false. Plaintiff Mason did not receive any compensation from the Purchased Business during the relevant period and did not begin receiving compensation until March 2025. Plaintiff Mason's compensation, when it began, was materially less than that paid to Defendant Slaton and to senior field personnel, and substantially lower on an hourly basis than compensation charged by Defendant Lawrence.

60B. The circulation of these false statements—whether initiated, encouraged, or knowingly permitted by Slaton—furthered Defendants' coordinated pattern of internal sabotage, misdirection, and interference with Plaintiffs' authority and operations during a critical transition period.

61. Slaton provided client David B. Small with internal information that only Slaton would have known from his role managing Small's projects. Small's attorney later confirmed that this information came from a former Thomas Lawrence supervisor — which information could only have come from Slaton given his role and access. The disclosure of this proprietary information directly precipitated Small's refusal to pay outstanding invoices and the current lien dispute, resulting in the termination of Plaintiffs' two largest projects and the immediate loss of more than $235,000 in contracted revenue, field employee layoffs, and leaving Plaintiff Mason as the sole remaining employee of the Purchased Business, followed by the eventual operational breakdown of the business Plaintiffs had acquired.

62. Slaton then accepted a position as a project engineer with Arrow Electric, LLC ("Arrow Electric"), owned by James Foltz, a client whose relationship was part of the assets Plaintiffs had purchased from Lawrence. Slaton's role at Arrow Electric placed him in a position to continue interfering with projects and clients tied to the acquired business and to undermine Plaintiffs' work and reputation.

63.   After his termination, Defendant Joel Daniel Slaton—who was at all times an independent contractor of Plaintiffs, not an employee—knowingly violated his Independent Contractor Agreement ("ICA") by accepting employment with Arrow Electric. The ICA strictly prohibited Slaton from performing any work, consulting, or services for purchased clients or from engaging in any conduct that interfered with Plaintiffs' ongoing operations.

64.   While working for Arrow Electric, Slaton inserted himself into a chandelier-collapse incident involving Arrow Electric's previously defective work—an incident directly tied to the purchased client base. Instead of supporting Plaintiffs or honoring his contractual obligations, Slaton used this event as an opportunity to further undermine Plaintiffs' business, communicate behind Plaintiffs' back, and damage critical client relationships. His actions further undermined Plaintiffs' business relationships and disrupted ongoing operations.

65.   Because Slaton was an independent contractor, none of the protections afforded to employees apply. His conduct constituted a direct breach of contract, prohibited competition, forbidden engagement with a purchased client, and intentional interference, all undertaken for the benefit of Arrow Electric and to the detriment of Plaintiffs.

66.   Throughout 2025, Defendants continued a pattern of coordinated interference, diversion of opportunities, and behind-the-scenes communications with key clients and vendors. Lawrence and Slaton used TLE, Inc., CRA, LLC, and Joel Slaton Enterprises, Inc. as vehicles to receive diverted funds, perform competing work, and erode the value of the goodwill and business Plaintiffs had purchased.

66A. As a direct and foreseeable result of Defendants' misrepresentations before the sale and their sabotage, interference, and diversion of funds and opportunities after the sale, Plaintiffs suffered substantial financial losses, the collapse of the newly acquired business, severe emotional distress, and other damages in an amount believed to exceed $30,000,000, exclusive of interest and costs. Defendants' post-closing breaches further caused Plaintiffs to incur unreimbursed project losses and shortfalls on purchased contracts, including losses resulting from Defendant Slaton's failure to properly invoice and administer customer accounts and Defendant Lawrence's failure to ensure adequate field supervision under his license. The full scope and amount of these damages will be established at trial.

67. Defendant Slaton was instructed to make outbound telephone calls to customers identified on the company's internal past-customer calling list, consisting of former clients with whom Slaton had prior relationships. The purpose of this outreach was to update company records, re-establish contact with past clients, and invite them to opt in to receive a free monthly newsletter providing useful information regarding the maintenance and care of Florida homes, with the further goal of generating potential future work through renewed dialogue. Slaton represented to Plaintiff Alek Mirko Mason that he was performing this outreach. In fact, Slaton did not perform the calls as represented and failed to carry out the outreach in a meaningful or effective manner consistent with Plaintiff Mason's instructions. Slaton's misrepresentations and failure to properly execute this outreach deprived Plaintiffs of a reasonable opportunity to revive goodwill and generate inbound business during a period when the Purchased Business was already experiencing suppressed cash flow and little new substantive business or inbound inquiries.

68. After closing, Defendant Joel Daniel Slaton repeatedly refused to perform core operational duties that were expressly expected of him under his Independent Contractor Agreement and as represented pre-sale. Slaton was repeatedly instructed to source, contact, and solicit competitive bids from subcontractors in order to improve pricing, margins, and operational efficiency. Slaton repeatedly refused or failed to perform this task, offering excuses that he was "too busy" or had not gotten to it, despite ample opportunity and repeated direction.

69. In a single exception during the David Small auto condo project, Slaton obtained only one subcontractor quote for electrical work, exclusively from Arrow Electric, pricing the work at $40,000. When Plaintiff Alek Mirko Mason demanded that at least one additional bid be obtained, the only competing quote Slaton produced—also from a licensed electrical contractor previously used by Lawrence and Slaton—came in at $17,000, less than half the Arrow Electric price. This disparity revealed that Slaton had intentionally limited bid sourcing to Arrow Electric and concealed materially lower market pricing from Plaintiff.

70. Also on the same auto-condo project, Slaton intentionally restricted the fire-protection scope to a single subcontractor without Plaintiff Alek Mirko Mason's knowledge or approval. Although Plaintiff Mason expressly instructed Slaton to obtain multiple competitive bids for the fire-protection system to control cost and ensure market pricing, Slaton solicited and received only one bid and proceeded to engage Imperial Fire Protection without presenting the proposal to Plaintiff Mason for review or approval. Slaton unilaterally advanced this subcontractor selection and pricing and further caused Plaintiff Mason to unknowingly execute a payment for Imperial Fire Protection's deposit under false pretenses, without disclosing that no competing bids had been obtained. This conduct concealed pricing and decision-making from Plaintiff Mason, inflated project costs, and benefitted Slaton's preferred subcontractors at Plaintiffs' expense.

71. In one representative instance of post-closing self-dealing, a third-party contractor quoted $54,000 to perform a scope of work that could have been completed internally by the Purchased Business through its existing field superintendent, Brian Doody, and an in-house crew of at least five employees then engaged by the Purchased Business. After closing, and without seeking or obtaining Plaintiff Alek Mirko Mason's approval, Defendant Lawrence unilaterally prepared and presented pricing to the homeowner in the amount of $55,000 and directed that the work be awarded to the outside contractor, despite lacking authority to bind the Purchased Business. Defendant Slaton executed and facilitated the agreement despite lacking authority under his Independent Contractor Agreement to bind the Purchased Business and without informing Plaintiff Alek Mirko Mason. After accounting for standard overhead, supervision, and general and administrative expenses, this project operated at a loss, while Defendants Lawrence and Slaton were paid for their involvement. This conduct deprived the Purchased Business of internal labor utilization, eliminated any possibility of profit, and further demonstrates Defendants' pattern of self-dealing and disregard for Plaintiffs' operational and financial interests.

72. Arrow Electric was repeatedly favored and treated as a "go-to" electrical subcontractor by Slaton, despite higher pricing and Slaton's undisclosed conflicts, including his later employment with Arrow Electric. Slaton's conduct deprived Plaintiffs of competitive subcontractor pricing and materially harmed profitability. Additional instances of similar conduct were identified and will be the subject of discovery.

**SECTION V – RICO ALLEGATIONS (18 U.S.C. §§ 1962(a), (c), and (d))**

73. Plaintiffs reallege and incorporate by reference Paragraphs 1 through 72 of this Complaint as if fully set forth herein

74. This action arises in substantial part from a pattern of racketeering activity conducted by Defendants Thomas Roger Lawrence, Thomas Lawrence Enterprises, Inc., Construction Resource Advisors, LLC, Joel Daniel Slaton, and Joel Slaton Enterprises, Inc. (collectively, "Defendants"), who operated as an association-in-fact enterprise for the purpose of inducing Plaintiffs into purchasing the business, diverting work-in-progress payments, sabotaging Plaintiffs' operations, and steering customers away from Plaintiffs for Defendants' own benefit.

75. Defendants formed and operated an "enterprise" within the meaning of 18 U.S.C. § 1961(4), consisting of themselves, their related entities, and the continuing coordination between Lawrence and Slaton to redirect customers, payments, business opportunities, and confidential information away from Plaintiffs following the December 12, 2024 asset purchase.

76. This association-in-fact enterprise is distinct from the pattern of racketeering activity and satisfies 18 U.S.C. § 1961(4) (Boyle v. United States, 556 U.S. 938 (2009)). The enterprise existed independently of the Asset Purchase Agreement and continued before, during, and after closing, using Plaintiffs' acquired business as the vehicle through which racketeering proceeds were diverted and goodwill reclaimed.

77. The scheme poses a continuing threat of criminal activity because Defendants still possess Plaintiffs' confidential client data and relationships (open-ended continuity) (see Torres v. S.G.E. Mgmt., LLC, 838 F.3d 629 (5th Cir. 2016)).

78. Lawrence directed and managed the enterprise and Slaton executed its day-to-day sabotage, satisfying the "operation or management" test (Reves v. Ernst & Young, 507 U.S. 170 (1993)).

79. Defendants' racketeering activities affected interstate commerce. Defendants routinely used interstate telephone calls, emails, electronic communications, wire transfers, ACH instructions, and multi-state business contacts to execute and conceal their fraudulent scheme. These communications were directed not only between Florida and Texas, but also into other states where Plaintiffs conducted business and performed pre-closing diligence. Before closing, while Plaintiff Alek Mirko Mason was physically present in the State of Wisconsin, he participated in a substantive multi-party telephone conference with Defendant Thomas Roger Lawrence, Defendant Joel Daniel Slaton, and Lawrence's business broker to discuss the business, its operations, goodwill, estimating practices, management structure, and future prospects. Defendants' representations during that interstate call were made in furtherance of the sale and for the purpose of inducing Plaintiffs to proceed with closing, and formed part of the fraudulent inducement alleged herein. Defendants also utilized interstate banking channels and electronic payment systems in furtherance of the scheme, including wire and ACH transmissions associated with customer deposits and closing-related payments. Defendants' scheme depended on, and was furthered by, these interstate channels of communication and financial transmission.

80. Predicate acts include repeated instances of wire fraud in violation of 18 U.S.C. § 1343 and mail fraud in violation of 18 U.S.C. § 1341, consisting of interstate electronic communications, wire transfers, ACH instructions, and the receipt and retention of client payments transmitted through the United States mail, all used to induce Plaintiffs into the transaction, divert funds, conceal material facts, and misappropriate business opportunities.

81. Defendants Lawrence and Slaton used interstate wires—including numerous emails, texts, phone calls, and electronic transfers—to make material misrepresentations about (a) the financial health of the business, (b) the volume and stability of incoming clients, (c) the capabilities and integrity of Slaton as "General Manager," (d) the existence of ongoing client relationships, and (e) their adherence to non-compete, non-interference, and independent contractor obligations.

82. As part of the fraudulent scheme, Defendants diverted substantial client deposits and work-in-progress receivables both before and after the December 12, 2024 closing through a combination of interstate banking systems, electronic transfers, wire communications, and physical receipt of client payments transmitted by mail. These diversions were intentionally concealed from Plaintiffs at and after closing and collectively constituted a six-figure misappropriation of business funds, depriving Plaintiffs of operating capital and sabotaging Plaintiffs' ability to perform purchased projects.

83. On information and belief, multiple diverted client payments were transmitted to Defendants by physical check through the United States mail and received by Defendants at locations under their control. Certain clients resided outside the immediate vicinity of Plaintiffs' office and routinely transmitted payments by mail when not physically present, including clients who resided out of state for portions of the year. Defendants knowingly intercepted, retained, and concealed these mailed payments as part of the same fraudulent scheme to deprive Plaintiffs of revenue belonging to the acquired business.

84. Defendants further engaged in continued acts of interference—including providing inside information to clients such as David Small, steering calls to Lawrence after the sale, telling callers that Lawrence "still works with customers," and positioning Lawrence to reclaim clients from the business he had just sold—constituting repeated use of interstate wires in furtherance of fraud.

85. Slaton's post-termination conduct—including accepting employment with Arrow Electric (owned by a purchased customer), violating the Independent Contractor Agreement, interfering with Plaintiffs' business relationships, and inserting himself into the chandelier-collapse matter—was undertaken in furtherance of the enterprise's wire-fraud scheme and was carried out through interstate emails, telephone calls, and electronic communications.

86. The acts described above form a "pattern of racketeering activity" under 18 U.S.C. § 1961(5) because they consist of numerous related predicate acts spanning more than one year, directed toward a common fraudulent purpose, and posing a continuing threat of ongoing unlawful activity.

87. The predicate acts described above were not isolated events, but were related and continuous, sharing common participants, victims, methods, and purposes. These acts demonstrate closed-ended continuity through repeated conduct occurring over a defined period and open-ended continuity because the scheme posed an ongoing threat of continued racketeering so long as Defendants retained access to Plaintiffs' customers, funds, and business relationships.

88. Defendants violated 18 U.S.C. § 1962(a) by using and investing income derived from racketeering activity—including diverted client deposits and misappropriated payments—to establish, capitalize, and operate Construction Resource Advisors, LLC and Joel Slaton Enterprises, Inc., and to continue operating Thomas Lawrence Enterprises, Inc. ("TLE, Inc.") after the December 12, 2024 asset sale. This occurred notwithstanding that TLE, Inc.'s operating business, customer relationships, goodwill, and rights to trade name usage had been sold or contractually licensed to Plaintiff Alek Mirko Mason, together with minority co-investors, and were subject to post-closing non-compete, non-interference, and customer-assignment obligations. Defendants' investment of racketeering proceeds enabled the continued parallel operation of competing entities, the maintenance of brand confusion through use of the Thomas Lawrence Enterprises name, and the reclamation and diversion of customer relationships previously sold to Plaintiffs. These investment-based acts caused injuries separate and distinct from the underlying predicate acts, including loss of transferred goodwill, erosion of brand value, customer confusion during the transition period, and the structural displacement of Plaintiffs from the market they purchased.

89. Each Defendant knowingly participated in the conspiracy by committing, aiding, directing, facilitating, or concealing fraudulent acts in furtherance of the enterprise.

89A. Defendants knowingly agreed and conspired to conduct and participate in the affairs of the enterprise through a pattern of racketeering activity, and each Defendant agreed that at least one conspirator would commit acts of wire fraud in furtherance of the scheme.

90. As a direct and proximate result of Defendants' RICO violations, Plaintiffs suffered injuries to business and property exceeding $30,000,000, including loss of business value, loss of work-in-progress payments, loss of incoming clients, reputational harm, interruption of projects, collapse of operations, loss of the business itself, and severe financial and emotional hardship.

91. Under 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages, attorneys' fees, costs, and all other appropriate relief.

**SECTION VI – RICO COUNT**
**18 U.S.C. §§ 1962(a), 1962(c), and 1962(d)**
**(Against All Defendants)**

92.     Plaintiffs reallege and incorporate by reference Paragraphs 1 through 91 of this Complaint as if fully set forth herein.

93.     At all relevant times, Defendants Thomas Roger Lawrence, Thomas Lawrence Enterprises, Inc., Construction Resource Advisors, LLC, Joel Daniel Slaton, and Joel Slaton Enterprises, Inc. knowingly conducted and participated, directly or indirectly, in the conduct of the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

94.     The "enterprise" consisted of an association-in-fact comprised of Lawrence, his controlled entities, Slaton, and Slaton's entity, together with related insiders and instrumentalities, including accounts, records, and communication channels, functioning as a continuing unit with common purpose, relationships, and longevity sufficient to pursue Defendants' unlawful objectives.

95.     The common purpose of the enterprise was to fraudulently induce Plaintiffs to purchase the assets and goodwill of the business, secretly retain and divert revenues and deposits belonging to Plaintiffs, recapture customer relationships sold under the Asset Purchase Agreement, sabotage Plaintiffs' operations, extract improper consulting and insurance payments, and unlawfully interfere with Plaintiffs' contractual and business relationships, all for Defendants' financial benefit.

96.     The enterprise operated through a structured and deliberate scheme designed to deprive Plaintiffs of operating capital, suppress revenue, and ensure the collapse of the acquired business. The scheme followed a consistent pattern: **(1)** Defendants diverted customer pre-payments and deposits belonging to Plaintiffs; **(2)** Defendants interfered with and redirected customer relationships and business opportunities sold under the Asset Purchase Agreement; and (3) Defendant Joel Daniel Slaton, who exercised control over job close-out, billing preparation, and invoice transmission, intentionally withheld, delayed, or failed to transmit final invoices and billings for completed or substantially completed work that Plaintiffs were contractually entitled to invoice and collect. This conduct prevented earned revenue from entering Plaintiffs' accounts, manufactured artificial cash shortages, and was designed not merely to harm but to destroy Plaintiffs' ability to operate the purchased business.

96A.    During the same period, Slaton continued to bill Plaintiffs for his own services while knowingly suppressing Plaintiffs' receivables by failing to issue required invoices, demonstrating that the omission was intentional rather than inadvertent. This selective billing conduct functioned as a financial chokehold on Plaintiffs' business and furthered the objectives of the racketeering enterprise.

96B. The racketeering enterprise further operated through deliberate concealment, information control, and suppression of internal inquiry designed to prevent discovery of the scheme while it was ongoing. Immediately following closing, Defendant Joel Daniel Slaton intentionally excluded Plaintiff Elena Yancheva Yaneva from meaningful operational communication, ignored inquiries, and provided only minimal or evasive responses when questioned regarding business activities. This conduct was not incidental or interpersonal, but part of a broader pattern of restricting access to information, controlling internal knowledge, and obstructing oversight. As Defendants' misconduct continued, Plaintiff Elena Yancheva Yaneva undertook extensive internal forensic review of financial records, customer payments, and operational data beginning in early 2025, with Plaintiff Alek Mirko Mason devoting substantial time and effort assisting in that investigation. The diversion of Plaintiffs' labor away from revenue-generating business activity and toward uncovering Defendants' concealed misconduct was a foreseeable and intended consequence of the enterprise's scheme and constitutes additional injury to Plaintiffs' business and property. Defendants' acts of concealment were integral to the operation and continuity of the racketeering enterprise and delayed Plaintiffs' discovery of the full scope of Defendants' unlawful conduct.

96C. In furtherance of the enterprise and to preserve its continuity, Defendants exploited Defendant Slaton's embedded position within the purchased business and his control over customer relationships represented as goodwill, creating a functional restraint on Plaintiffs' ability to remove him despite persistent nonperformance. In ordinary circumstances, a general manager who fails to generate, support, or protect revenue would be subject to prompt termination. Here, however, Slaton's role as the gatekeeper to customer relationships sold as goodwill—combined with Defendants' coordinated concealment, interference, and information control—operated to insulate him from removal while the racketeering scheme remained ongoing. This structural restraint was integral to maintaining the enterprise's control over revenue, customer access, and internal information flow, and allowed Defendants to continue diverting funds, suppressing receivables, and interfering with Plaintiffs' operations without detection or interruption.

97. Defendants engaged in a pattern of racketeering activity consisting of multiple related predicate acts and associated acts of concealment and information control, including but not limited to wire fraud and mail fraud in violation of 18 U.S.C. §§ 1341 and 1343, theft of services, financial embezzlement, and the interstate transmission of fraudulent communications, occurring over an extended period of time and posing a threat of continued criminal activity.

98.    Defendants' predicate acts included multiple related acts of wire fraud, mail fraud, theft, and conversion, including but not limited to:

(a) the diversion and retention of substantial customer deposits and work-in-progress payments belonging to Plaintiffs, both before and after closing;

(b) unauthorized electronic and online payments initiated from Plaintiffs' accounts to satisfy obligations of Defendants' retained or parallel entities;

(c) the transmission of materially false and misleading work-in-progress and financial information during the closing process to conceal diverted funds;

(d) the interception, deposit, and concealment of customer payments belonging exclusively to Plaintiffs;

(e) the intentional suppression of earned receivables by Defendant Slaton through failure to issue required invoices; and

(f) the misuse and transmission of Plaintiffs' confidential business information to facilitate interference and diversion of work.

99.    Defendants committed numerous predicate acts of wire fraud and mail fraud in furtherance of the enterprise through interstate emails, telephone calls, electronic transfers, and other interstate communications used to divert funds, conceal material facts, suppress Plaintiffs' receivables, misappropriate customer deposits, and interfere with Plaintiffs' business. These acts occurred repeatedly over an extended period of time, some of which are reflected in *Exhibit D and Exhibit E*, which provide representative examples of the racketeering conduct alleged herein. These predicate acts occurred both before and after the December 12, 2024 closing and continued after Defendant Slaton's termination, including post-termination disclosures of Plaintiffs' confidential information, interference with active projects, and communications intended to divert clients and sabotage Plaintiffs' business, thereby establishing both closed-ended and open-ended continuity.

100.    Defendants further used and invested income derived from this racketeering activity to operate and sustain parallel entities, finance competing and unauthorized work, and continue interference with Plaintiffs' purchased business, thereby causing injury distinct from the predicate acts themselves, in violation of 18 U.S.C. § 1962(a).

101.    Defendants knowingly conspired to conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity, agreeing and coordinating with one another to commit the predicate acts described herein, in violation of 18 U.S.C. § 1962(d).

102.    Each Defendant knowingly agreed that a member of the conspiracy would commit at least two racketeering acts and took overt acts in furtherance of the conspiracy, including communications, financial transactions, document transfers, and coordinated interference with Plaintiffs' business and customers.

103. As a direct and proximate result of Defendants' violations of 18 U.S.C. §§ 1962(a), (c), and (d), Plaintiffs suffered substantial injury to their business and property, including lost revenues, lost customers, operational collapse, reputational harm, diversion of funds, diverted labor and investigative costs necessitated by Defendants' concealment, litigation costs, and damages exceeding $30,000,000.

104. Defendants' conduct was willful, knowing, malicious, and undertaken with conscious disregard for Plaintiffs' rights, entitling Plaintiffs to treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

105. Plaintiffs seek all relief available under 18 U.S.C. § 1964, including injunctive relief, disgorgement, forfeiture, divestiture, and treble damages, as set forth below.

**SECTION VII – FRAUDULENT INDUCEMENT**
**(Florida Common Law)**
**(Against Defendants Lawrence, Slaton, Thomas Lawrence Enterprises, Inc.**
**and Joel Slaton Enterprises, Inc.)**

106. Plaintiffs reallege and incorporate by reference Paragraphs 1 through 105 of this Complaint as if fully set forth herein.

107. Prior to entering into the Asset Purchase Agreement, Defendants knowingly made false statements of material fact and omitted material information for the purpose of inducing Plaintiffs to purchase the business and its goodwill.

108. Defendant Thomas Roger Lawrence, directly and through materials prepared by his business broker, represented to Plaintiffs that he was retiring from the business, stepping away from day-to-day operations, and relocating to North Carolina following the sale in order to spend time with his wife, children, and grandchildren. These representations concerned Lawrence's present intent and existing plans at the time they were made, not aspirational future possibilities. Immediately following the closing, Lawrence personally called Plaintiff Alek Mirko Mason on his mobile phone and stated unequivocally, 'Thank you for allowing me to retire." At the time these representations were made, Lawrence knew that he would continue operating in the same market, remain geographically proximate to the customer base, and maintain involvement in customer relationships after closing.

109. These representations were made orally, in writing, and through the Confidential Information Memorandum provided to Plaintiffs in connection with the sale, and were repeated during pre-closing negotiations and diligence discussions.

110. Lawrence further represented that Defendant Joel Daniel Slaton was a fully capable and experienced "General Manager" who already ran the business operationally, could estimate projects, manage personnel, oversee bookkeeping and job execution, and would effectively operate the business without Lawrence's involvement following closing.

111. Lawrence represented that he regularly received one to two serious new client inquiries per week, that the business enjoyed strong referral momentum, and that Plaintiffs would benefit from continued goodwill and referral flow after closing.

112. These representations were material to Plaintiffs' decision to purchase the business, as Plaintiffs expressly informed Lawrence that they did not intend to be hands-on operators and relied on the existence of a competent general manager and a clean separation from the seller post-closing.

113. In fact, immediately following closing, Lawrence took concrete actions inconsistent with his representations, including remaining in the same geographic market, maintaining ongoing involvement with customers, continuing to operate through Thomas Lawrence Enterprises, Inc. and other entities, and actively competing for work and goodwill that had been sold to Plaintiffs. These actions confirm that Lawrence's pre-closing representations regarding retirement, relocation, and disengagement were false when made.

114. Lawrence omitted a material fact that he resided in the same neighborhood as a substantial portion of the business's customer base and that he was a member of the neighborhood's Architectural Review Board, giving him ongoing influence over customers, projects, and approvals within the very market Plaintiffs believed they were purchasing free and clear.

115. Even the limited transition support Plaintiffs requested in the LOI was not provided. During the first full week following closing, Plaintiffs were unable to be present on-site to begin transition activities due to timing and logistics associated with coming from their home in Texas. During the immediately following week, Lawrence closed the office entirely and provided no transition assistance. Despite the absence of any transition support during either period, Lawrence nonetheless charged Plaintiffs for purported "transition time" for both weeks.

116. Lawrence further failed to disclose that he would require Plaintiffs to pay him a non-negotiable consulting rate of $150 per hour post-closing, in addition to monthly payments for use of his license as qualifier, and that he would impose additional mileage charges that were never disclosed, negotiated, or agreed to prior to closing.

117. Shortly following closing, Defendant Lawrence began extracting consulting and mileage payments from Plaintiffs, notwithstanding his pre-closing representations that he was retiring, disengaging from active operations, and stepping away from the business. These payments were neither disclosed, negotiated, nor contemplated as part of the Asset Purchase Agreement or the sale process and were extracted only after Plaintiffs had relied on Lawrence's materially false representations regarding his retirement and withdrawal from the business in deciding to proceed with the transaction.

118. Immediately after closing, Lawrence called Plaintiff Alek Mirko Mason to congratulate him on the purchase and expressly stated, "thank you for allowing me to retire," reinforcing the false narrative upon which Plaintiffs had already relied.

119. Contrary to Defendants' representations, Defendant Joel Daniel Slaton did not function as an independent General Manager capable of estimating meaningful or complex projects, supervising operations, or supporting the ongoing generation and development of business as represented prior to closing. At the time these representations were made, Defendant Thomas Roger Lawrence knew or recklessly disregarded that Slaton lacked the estimating, managerial, and operational capacity portrayed, as evidenced by Slaton's limited pre-closing role, his inability to independently prepare substantive estimates, and his dependence on Lawrence's direct involvement for operational decision-making even before the transaction closed.

120. Further confirming the falsity of Defendants' representations, Slaton's own contemporaneous handwritten schematic—prepared in the ordinary course and prior to or contemporaneous with closing—depicted his role as providing "bookkeeping / administrative services" to multiple entities and did not identify himself as a General Manager, operational leader, or project executive for the business sold to Plaintiffs. This internal documentation is inconsistent with Defendants' representations that Slaton functioned as a fully capable General Manager and corroborates that Lawrence knowingly overstated Slaton's role, authority, and operational competence in order to induce Plaintiffs to proceed with the transaction.

121. Defendants' representations regarding the existence of consistent incoming business were false when made. Lawrence affirmatively represented that the business regularly received one to two serious new client inquiries per week and that Plaintiffs would benefit from continued inbound demand and referral momentum after closing. In fact, from the date of closing forward, Plaintiffs did not receive a single new job from a new client generated through any inbound inquiry, referral system, or existing goodwill represented by Lawrence. The complete absence of new-client work following closing confirms that the purported pipeline and referral momentum did not exist at the time of sale and that these representations were materially false and misleading when made.

122. Defendants' misconduct did not stop at the absence of inbound business. Following closing, Defendants affirmatively interfered with, diverted, and reclaimed customer relationships that had been sold to Plaintiffs as part of the transaction. Rather than supporting Plaintiffs' operation of the Purchased Business, Lawrence and Slaton engaged in conduct designed to suppress Plaintiffs' ability to generate revenue, including steering inquiries away from Plaintiffs, reassuring customers that Lawrence remained available to perform work, and positioning Lawrence to recapture projects and goodwill that Plaintiffs had purchased. This affirmative interference further confirms that Defendants never intended to transfer functioning goodwill or allow Plaintiffs to benefit from the customer pipeline represented prior to closing.

123. Defendants' representations and omissions were false at the time they were made, concerned material facts, and were known by Defendants to be false or misleading when made.

124. Defendants intended that Plaintiffs rely upon these misrepresentations and omissions in deciding to purchase the business and enter into the Asset Purchase Agreement.

125. Plaintiffs reasonably and justifiably relied on Defendants' representations and omissions in proceeding with the purchase and could not have reasonably discovered their falsity through ordinary diligence prior to closing, given Defendants' exclusive control over customer relationships, internal operations, and the information misrepresented or omitted.

126. As a direct and proximate result of Defendants' fraudulent inducement, Plaintiffs entered into the transaction, paid substantial consideration, assumed liabilities, and thereafter suffered significant financial loss, business collapse, loss of goodwill, and damages exceeding $30,000,000.

127. Defendants' conduct constitutes fraudulent inducement under Florida common law, entitling Plaintiffs to rescission-related damages, compensatory damages, consequential damages, and all other relief allowed by law.

128. These misrepresentations regarding Defendant Joel Daniel Slaton's experience, competence, and ability to operate the business independently were material, false when made, and central to Plaintiffs' decision to proceed with the transaction. Lawrence knew or recklessly disregarded that Slaton lacked the estimating, managerial, and operational capabilities represented, and intentionally overstated Slaton's role and competence to induce Plaintiffs to purchase the business at full asking price.

129.   Plaintiff Alek Mirko Mason reasonably relied on Defendants' affirmative representations and material omissions in deciding to purchase the business at full asking price of $1,016,000 without negotiating a reduction. Lawrence's representations regarding his retirement and departure from the market, Slaton's competence as a General Manager and estimator, the existence of a stable and ongoing client pipeline, and the continuity of operations were material to Plaintiff's decision-making and were presented as complete and truthful. Defendants intentionally omitted material facts that rendered those representations misleading, including Lawrence's intent to remain active in the market, his continued proximity and influence over the customer base, Slaton's lack of operational and estimating competence, and the absence of genuine new-client flow.

130.   Plaintiff relied on Defendants' misrepresentations and omissions by proceeding with the purchase on Defendants' stated terms and paying full price, believing he was acquiring a self-sustaining business that would continue generating work without aggressive personal solicitation. Instead, as a direct and proximate result of Defendants' fraudulent inducement and post-closing interference, Plaintiff was forced into an unanticipated role of personally chasing work while diverted funds, sabotaged customer relationships, and suppressed cash flow deprived the company of the resources necessary to hire personnel, sustain operations, or stabilize the business, causing rapid financial destabilization and collapse.

131.   Plaintiffs' fraudulent-inducement damages are independent of any breach of the Asset Purchase Agreement under Florida law because they include both pre-closing and post-closing six-figure losses arising from: (a) Defendants' pre-closing solicitation, receipt, and retention of customer deposits and advance payments to which Defendants were not entitled and which were fraudulently concealed and mischaracterized at closing; (b) the post-closing conversion and retention of customer deposits and pre-payments that belonged to Plaintiffs after closing; (c) the destruction of purported goodwill that was never actually transferred because it was personal to Lawrence; and (d) intentional internal sabotage, concealment, and post-closing competition that rendered the purchased business effectively worthless within weeks of closing.

**SECTION VIII – EQUITABLE RELIEF**
**(Constructive Trust, Equitable Lien, Tracing, and Accounting)**
**(Against All Defendants, as applicable)**

132.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 131 of this Complaint as if fully set forth herein.

133.    Defendants engaged in a knowing and intentional scheme of fraud, racketeering activity, concealment, and wrongful conduct that resulted in the diversion, misappropriation, and commingling of Plaintiffs' money, business opportunities, contractual rights and goodwill.

134.    As a direct and proximate result of Defendants' misconduct, Plaintiffs' funds and the proceeds thereof were used, directly or indirectly, to pay Defendants' personal and living expenses, including but not limited to mortgage payments, property taxes, insurance premiums, utilities, maintenance costs, capital improvements, debt service, and other expenditures necessary to acquire, preserve, enhance, or maintain Defendants' real and personal property.

135.    Defendants further commingled fraud proceeds with personal accounts and assets, utilized affiliated entities and insiders to obscure ownership and control, and failed to maintain transparent or accurate records, thereby rendering purely legal remedies inadequate and necessitating equitable relief.

136.    Plaintiffs are entitled to the imposition of a constructive trust over all property, real or personal, and any proceeds or beneficial interests therein, to the extent such property was acquired, preserved, enhanced, or maintained using funds, value, or opportunities traceable to Defendants' fraudulent and racketeering conduct.

137.    Plaintiffs are further entitled to the imposition of an equitable lien upon any such property and upon the proceeds of any sale, transfer, refinancing, inheritance, or other disposition thereof, to prevent Defendants from unjustly retaining the benefits of their misconduct and to preserve assets for satisfaction of judgment.

138.    Plaintiffs are entitled to equitable tracing, disclosure, and a full accounting to identify all assets, equity, proceeds, interests, records, and information derived from, commingled with, or connected to Defendants' wrongful conduct, including assets and records held individually, jointly, in trust, or through any nominee, insider, family member, affiliated entity, or third party. Legal remedies are inadequate because Defendants concealed, diverted, and misallocated funds and information, rendering the true financial condition and disposition of Plaintiffs' property incapable of determination absent equitable relief.

138A. Plaintiffs are further entitled to equitable relief compelling the identification, accounting for, and immediate turnover and disgorgement of all business records, documents, electronic files, and information belonging exclusively to Plaintiffs and the Purchased Business that Defendants retained, concealed, or failed to deliver at or after closing. This includes, without limitation, complete accounting records, general ledgers, QuickBooks and other accounting-system files, native data files, audit logs, user histories, backups, and supporting documentation necessary to reconstruct customer deposits, work-in-progress balances, receivables, and pre- and post-closing transactions. Defendants' continued possession and withholding of such records—including records acknowledged by Defendant Slaton to remain in Defendant Lawrence's possession—prevents accurate reconstruction of Plaintiffs' finances and constitutes ongoing concealment requiring equitable intervention.

138B. Plaintiffs further seek equitable relief requiring disclosure, preservation, and accounting sufficient to trace Defendants' diversion, concealment, and interference, including records reflecting the creation, modification, deletion, suppression, or manipulation of financial entries, as well as communications and coordination among Defendants before and after closing. Such relief necessarily encompasses records and data associated with communication systems and repositories used directly or indirectly in connection with, or to facilitate or conceal, Defendants' conduct, including mobile and home telephones, call logs, voicemail systems, electronic messaging platforms, cloud-based storage services, and electronic mail accounts of any kind—whether personal or business—hosted by providers including, without limitation, Gmail, Yahoo, Microsoft, iCloud, or any other service. Plaintiffs seek this relief to identify the existence, location, custody, control, and disposition of assets, records, communications, and information wrongfully withheld or used to facilitate Defendants' misconduct.

139. Plaintiffs seek equitable relief to the maximum extent permitted by law, including relief that may become effective upon any future transfer, encumbrance, refinancing, monetization, or other disposition of property, or upon the termination, waiver, or inapplicability of any exemption, protection, or legal status that may presently apply.

140. Absent the equitable relief requested herein, Defendants will be unjustly enriched and Plaintiffs will suffer irreparable harm for which there is no adequate remedy at law, including the continued dissipation, concealment, and transformation of assets traceable to Defendants' wrongful conduct.

141. Plaintiffs further seek equitable relief extending to Defendants' present and future income streams, including but not limited to wages, salaries, consulting fees, management fees, commissions, distributions, profit shares, licensing fees, dividends, and any other form of compensation or remuneration earned directly or indirectly by Defendants, to the extent such income is derived from, connected to, or traceable to Defendants' wrongful conduct or used to evade satisfaction of judgment.

142.   Plaintiffs are entitled to equitable relief preventing Defendants from frustrating enforcement of any judgment through the use of nominees, alter-ego entities, family members, insiders, trusts, or newly formed business entities, including by diverting or redirecting income, contracts, or business opportunities to third parties for the purpose of avoiding payment of damages.

143.   Plaintiffs are further entitled to injunctive and equitable relief restraining Defendants, pending satisfaction of any judgment entered herein, from transferring, encumbering, concealing, dissipating, or otherwise disposing of assets, income, receivables, or business interests traceable to or derived from Defendants' wrongful conduct, except for reasonable and necessary ordinary living expenses and bona fide arm's-length transactions made for fair value, and requiring Defendants to provide advance notice and disclosure of any material asset transfer, entity formation, trust creation, or reallocation of income reasonably likely to impair Plaintiffs' ability to enforce a judgment.

144.   Plaintiffs further seek an order requiring Defendants to disclose, under oath, all sources of income, assets, accounts, business interests, and beneficial ownership interests held directly or indirectly within the past five (5) years, and to update such disclosures within ten (10) days of any material change, and in no event less frequently than once every sixty (60) days, until any judgment is satisfied in full.

145.   Plaintiffs seek such equitable relief pursuant to the Court's inherent equitable powers, applicable state-law remedies, and expressly under the authority of 18 U.S.C. § 1964(a), and do not seek an impermissible general prejudgment attachment of assets outside those authorities.

146.   Plaintiffs further seek equitable relief authorizing post-judgment discovery, accounting, tracing, and enforcement measures—including equitable garnishment, turnover orders, and income redirection—to ensure satisfaction of any judgment entered herein and to prevent Defendants from retaining the benefits of their misconduct through continued manipulation of assets or income.

## SECTION IX – RICO EQUITABLE RELIEF, FORFEITURE, AND DIVESTITURE (18 U.S.C. § 1964(a))
### (Against All Defendants)

147.   Plaintiffs reallege and incorporate by reference Paragraphs 1 through 146 of this Complaint as if fully set forth herein.

148.   Defendants conducted and participated, directly and indirectly, in the conduct of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962.

149. Pursuant to 18 U.S.C. § 1964(a), this Court is empowered to grant broad equitable relief to prevent and restrain violations of RICO, including but not limited to divestiture, disgorgement, forfeiture of interests, restrictions on future activities, and other remedial measures designed to eliminate the effects of racketeering activity. Such relief is sought for remedial and preventive purposes only, and not as punishment, in order to eliminate the continuing effects of Defendants' racketeering activity and to protect the public and Plaintiffs from future harm.

150. As a result of Defendants' racketeering conduct, Defendants acquired, maintained, and operated interests in property, businesses, and assets, including real and personal property, through the use of racketeering proceeds and unlawful control.

150A. Defendants further engaged in acts of concealment, commingling, and information control to obscure the location, ownership, and disposition of racketeering proceeds and enterprise-related assets. Pursuant to 18 U.S.C. § 1964(a), Plaintiffs seek equitable relief including a full accounting, tracing of funds, imposition of constructive trusts, and such other measures as necessary to identify, preserve, and recover assets derived from or used to facilitate the racketeering enterprise, whether held directly or indirectly, and whether presently held or subsequently transferred.

151. Plaintiffs seek an order requiring Defendants to forfeit and disgorge any and all interests, proceeds, profits, and benefits obtained, directly or indirectly, from the RICO enterprise and racketeering activity, including interests in real property to the extent permitted by law.

152. Plaintiffs further seek divestiture of Defendants' interests in any property, entity, business, or asset that was acquired, maintained, controlled, or operated through racketeering activity or with racketeering proceeds, or that enables, facilitates, conceals, obscures, or perpetuates the racketeering enterprise or its effects, including through commingling, nominee ownership, or non-disclosure of affiliated entities or interests, and an order barring Defendants from transferring, assigning, or conveying such interests to any insider, nominee, family member, trust, alter-ego entity, or affiliated person or entity for the purpose of evading forfeiture or judgment.

153. Plaintiffs seek such additional equitable relief as necessary to prevent and restrain future RICO violations, including orders restricting Defendants' ability to engage in business activities similar to those conducted through the enterprise.

154. Plaintiffs request that any forfeiture, disgorgement, or divestiture ordered herein attach to assets or proceeds at the time such assets become legally reachable, including upon transfer, sale, refinancing, inheritance, or other disposition.

## SECTION X – PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Alek Mirko Mason and Elena Yancheva Yaneva respectfully request that judgment be entered in their favor and against Defendants, and that the Court grant the following relief:

### A. RICO Relief.

Judgment against all Defendants for violations of 18 U.S.C. §§ 1962(a), (c), and (d), including treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### B. Compensatory Damages.

An award of compensatory damages in an amount to be proven at trial, but in no event less than $30,000,000, for, inter alia:

1. lost revenues resulting from the collapse of the purchased business;

2. theft and conversion of six-figure customer deposits and pre-payments belonging to Plaintiffs after closing;

3. misappropriation of insurance premium payments from Plaintiffs' operating accounts;

4. destruction of the purchased goodwill that was never actually transferred;

5. complete operational collapse of the acquired business within weeks of closing;

6. reputational harm to Plaintiffs and the business;

7. severe emotional distress, physical exhaustion, and disruption to family life suffered by Plaintiffs, including the foreseeable exacerbation of Plaintiff Elena Yancheva Yaneva's medical circumstances known to Defendants, as described in 24A above; and

8. all other consequential, incidental, and special damages proximately caused by Defendants' unlawful conduct.

### C. Disgorgement and Restitution.

An order requiring Defendants to disgorge and return all monies, benefits, and value wrongfully obtained, directly or indirectly, as a result of Defendants' unlawful conduct, including but not limited to:

1. diverted customer deposits and pre-payments belonging to Plaintiffs;

2. customer deposits concealed or retained through manipulation of work-in-process or other accounting practices;

3. deposits received before or after closing for projects that had not commenced and belonged exclusively to Plaintiffs;

4. misappropriated liability-insurance premium payments withdrawn from Plaintiffs' operating accounts;

5. consulting fees, management fees, or other compensation wrongfully paid to Lawrence, Slaton, or their affiliated entities; and

6. any additional funds, proceeds, profits, or benefits proven through discovery to have been derived from or connected to Defendants' wrongful conduct.

**D. Rescission of Asset Purchase Agreement.**

In the alternative to damages, and solely to the extent necessary to effectuate full restitution and equitable relief, an order rescinding the Asset Purchase Agreement dated December 12, 2024 (the 'APA'), on grounds of fraudulent inducement, material misrepresentations, and material omissions, and restoring the parties to their pre-transaction positions, including:

1. return to Plaintiffs of the full purchase price and all transaction-related payments;

2. restitution for post-closing losses, diverted revenues, and operational damages;

3. disgorgement of any benefits wrongfully retained by Defendants.

**E. Permanent Injunctive Relief – Restrictive Covenants and Interference.**

A permanent injunction prohibiting Defendants Lawrence and Slaton, and all entities controlled by them, from:

1. contacting, soliciting, servicing, interfering with, or accepting work from any customers sold under the Asset Purchase Agreement;

2. using or disclosing Plaintiffs' confidential or proprietary business information;

3. falsely representing ownership, control, affiliation, or continued involvement with the business sold to Plaintiffs.

**F. Injunctive Relief – Joel Daniel Slaton / Arrow Electric.**

A permanent injunction enforcing Slaton's Independent Contractor Agreement and applicable law by prohibiting Joel Daniel Slaton from working for, assisting, or performing services for Arrow Electric or any entity owned or controlled by customers sold under the Asset Purchase Agreement, to the extent such work violates his contractual restrictions, fiduciary duties, or facilitates interference with Plaintiffs' purchased business.

**G. Accounting.**

An order requiring a full accounting of all customer payments, deposits, insurance payments, consulting fees, and related financial and communication records, including accounting-system data, transaction histories, call records, electronic communications, and associated metadata, sufficient to trace Defendants' diversion, concealment, and interference before and after closing.

**H. Preservation and Disclosure of Records.**

An order requiring Defendants to preserve, disclose, and produce accounting records, telephone and call records, electronic communications, email accounts, cloud-stored data, and related information reasonably necessary to identify, trace, and prevent further concealment of assets, communications, and business records implicated in Defendants' misconduct.

**I. Declaratory Relief.**

A declaration that Defendants materially breached the Asset Purchase Agreement, Independent Contractor Agreement, and related covenants, and that Plaintiffs are excused from further performance thereunder.

**J. Pre- and Post-Judgment Interest.**

An award of pre-judgment and post-judgment interest as allowed by law.

**K. Costs and Attorneys' Fees.**

An award of costs, litigation expenses, and attorneys' fees as provided by statute, contract, and equity.

**L. RICO Forfeiture and Divestiture Relief.**

An order pursuant to 18 U.S.C. § 1964(a) requiring Defendants to forfeit, disgorge, and divest themselves of any interests, proceeds, profits, or benefits obtained directly or indirectly through racketeering activity, including interests in real or personal property, whether legal, equitable, or beneficial, and providing that such forfeiture and divestiture shall attach at the time such assets become legally reachable, including upon sale, transfer, refinancing, inheritance, or other disposition, and imposing such restrictions and conditions as necessary to prevent and restrain future RICO violations.

**M. Further Relief.**

Such other and further legal or equitable relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: December 29, 2025

Sincerely,

Alek Mirko Mason
Plaintiff, Pro Se
P.O. Box 212
Willis, TX 77378
Telephone:

Elena Yancheva Yaneva
Plaintiff, Pro Se
P.O. Box 212
Willis, TX 77378